GUNN, Trustee, and others *v.* SAVAGE and others.

(*Circuit Court, D. Connecticut.* March 3, 1887.)

PATENTS FOR INVENTIONS — CLAIMS — SPECIFICATIONS — DRAWINGS SUPPLYING OMISSIONS.

Where one part of an invention is properly described, and the second part is not alluded to in the written or descriptive part of the specification, but is shown in the drawings, and the second claim is broad enough to include the second portion of the invention if it had been properly described in the specification, the drawings cannot supply the entire absence of written description, and enable the second claim to be so construed as to include the omitted portion of the invention.

In Equity.

*Bowdoin S. Parker* and *Charles E. Perkins,* for plaintiffs.
*Marcus H. Holcomb* and *Charles E. Mitchell,* for defendants.

SHIPMAN, J. This is a bill in equity which is founded upon the alleged infringement of letters patent No. 314,189 and No. 314,192, each dated March 17, 1885, and each issued to William Pearce; the first-mentioned patent being for improvements in dies for forging ox-shoes, and the second being for an improved method of forging ox-shoes. The second patent is for the method of making shoes by the use of the dies of the first patent. As the decision of this case depends, in my opinion, upon the construction to be placed upon No. 314,189, it is important to give in full the substantial part of the specification, which is as follows:

"The design of my invention is to enable ox-shoes to be more easily, quickly, and cheaply produced by means of dies, to which end said invention consists principally in the construction of the dies, whereby a number of shoes may be forged at one heat from a bar, substantially as and for the purpose hereinafter shown. It consists, further, in the series of dies used for forging a shoe, substantially as and for the purpose hereinafter set forth. It consists, finally, in combining with the forging dies, constructed substantially as shown, a trimming die adapted to receive the sprue-connected blanks and to trim from each the surplus metal, substantially as and for the purpose hereinafter specified.

"In the carrying into effect of my invention I make use of two forging dies, A and B, which for convenience are formed within one block of metal, and are arranged side by side, but may, if desired, be formed separately The first of said dies, A, has the general size and shape of the desired shoe, C, but is without means for forming the nail groove, while said second die, B, has the exact size and shape desired, and is provided with a $\wedge$-shaped rib, $b$, which operates to produce the said nail groove, $c$, in said shoe. In practice a straight bar of iron is heated and placed over the die, A, in substantially a line with the transverse centers of the calk-recesses, $a$ and $a^1$, in which position said bar is subjected to the action of a plain-faced upper die, and caused to fill the cavities of said die, A. The partially forged shoe, C, is now placed over the second die, B, and by means of said upper die is forced into the same and receives the exact shape required, including the nail groove, $c$.

"In order that shoes may be forged directly from a bar, at each end of each die, A and B, is formed an outward and downward inclined face, $a^2$ and $b^3$, respectively, which operates to produce a $\wedge$-shaped transverse notch, $c^1$, at

each end of the shoe, C, and nearly severs the metal at such point. After the first shoe, C, has been partially completed by action of the die, A, the heated bar is moved forward, until the notch, $c^1$, at its rear end fits over the correspondingly shaped part that is formed by the calk-recess, $a^1$, and the adjacent inclined face, $a^2$, and thus operates as a gauge and enables the longitudinal position of the bar to be easily and accurately determined. After shoe, C, has passed through the finishing die, B, it is placed over a female trimming die, D, within which is an opening, $d^1$, that corresponds to the outline of the completed shoe, and is then operated upon by an upper male die, E, which forces said shoe through said opening and removes all surplus metal from its edges. In order that said shoe when connected with the bar may more readily find a bearing upon said lower trimming die, the ends of the latter are provided with inclined faces, $d^1$, which correspond to the faces, $a^2$ and $b^3$, of the dies, A and B."

The claims are as follows:

"(1) The forging dies described, each of which beyond the end of its intaglio has the metal cut away to form a downward and outward inclining face, $a$ or $a^1$, substantially as and for the purpose specified. (2) The dies, A and B, constructed as described, and adapted for forging an ox-shoe from a straight bar of metal, substantially as set forth. (3) The series of dies, A, B, D, and E, constructed as described, and adapted for forging and trimming an ox-shoe, substantially as shown."

The invention which was in fact made by the patentee consisted of two parts: (1) The outward and downward inclined face at each end of each die, A and B, and which is particularly described in the first claim. The defendants do not infringe this claim. (2) Prior to this invention of Pearce, the blank was subjected to one or more forging or bending operations, before it was placed in the die, which gave it substantially the form of an ox-shoe. By his invention, a straight bar of heated iron having been placed in die, A, was subjected to the action of a plain-faced upper die, and was thereby brought into "a close approximation of the shape desired for making an ox-shoe." This blank was then placed in the second die, B, which contained a rib or means for forming the nail-groove, and was thereby finished, ready for the trimming dies, D and E. The dies B, D, and E were each old. A is a new die, whose characteristic, in the language of the plaintiff's expert, is "that there are no abrupt turns, and the contours are joined to the bottom of the sinkage by incline warped surfaces, so that the plastic metal is easily forced into all parts of the die, thus giving at a single operation a form so nearly perfect that it can be finished by placing it in a finishing die." "It isn't the shape of the die that gives it its peculiarity. The peculiarity of the die consists in forming a sinkage of easy-flowing surface especially adapted to receive and shape soft metal."

A vigorous attempt was made to show that a ribless die and the finishing die for forming the nail groove, which is always a ribbed die, had been consecutively used by John Deeble, one of the defendants, who offered much evidence to show that prior to the Pearce invention in suit he had made one size of ox-shoes by using, after the blank had been partially formed and bent by the use of other dies, a ribless die, instead of subjecting the blank directly to the ribbed or finishing die. This rib-

less die is said to have been used before the blank was completed by the ribbed die, because the rib frequently broke, unless the blank had been previously prepared by the ribless die. This may have been true; but if it was, it is immaterial, for the Deeble ribless die was a different article from the Pearce die, A, and the Deeble method of forging shoes was different from that of Pearce. By the Deeble process, the heated blank was struck edgewise in a die to give the requisite curve; it was then struck in another impression, whereby each end of the blank was bent to form rudimentary calks, and was then placed in the finishing die. If the Deeble ribless die existed, it, like the Miller ribless die, which also preceded Pearce, did not contain the incline warped surface upon the inside of the intaglio. By the Pearce die, A, a straight bar of heated iron was brought, without any previous manipulation or bending, into the general shape of an ox-shoe, in readiness for the finishing die. The state of the art shows no anticipation of such an effect upon a straight bar of iron by a single die. The invention consisted in two dies, A and B, the first new and the second old, by whose co-operative action, and without previous forging, a straight bar of iron can be forged into a finished ox-shoe, in readiness for the usual trimming dies. The novel feature was such a construction of die, A, that it forged a straight bar into such a shape that it was in complete readiness for the finishing die. The invention greatly reduced the cost of making forged ox-shoes, was not only novel and useful, but was the product of an inventive mind. The history of the gradual progress of the art is very instructive upon this point.

The important question in the case is whether the patent described the second part of the actual invention or omitted it so entirely that the second claim can only be construed to mean the dies, A and B, as described, which description was confined to the double inclined face of the first claim. The only peculiarity of construction which the descriptive part of the specification mentions is the one which the patentee says enables shoes to be forged directly from the bar, and consists in placing at each end of each die, A and B, an inclined face which produced a A-shaped transverse notch at each end of the shoe and nearly severed the metal at such point. This peculiarity is clearly pointed out. The only other thing which is said about the construction of dies, A and B, is that A has the general size and shape of the desired shoe, whereas the second die has the exact size and shape desired, and has the well-known rib for forming the nail-groove. Not a word and not an intimation is given that die, A, contained any peculiarity or any advantage by reason of the incline warped surfaces, or that the drawings showed a new feature of this kind, or that there was any construction which enabled shoes to be forged directly from a bar, except that of the two inclined ends, and the only knowledge in regard to the novelty of construction of either of the dies which can be gained from the descriptive part of the specification is with reference to the peculiarity pointed out in the first claim.

It is contended that the drawings indicate or show clearly to a skilled mechanic the new feature of the incline warped planes upon the inside

of the intaglio, and that therefore the drawings supplement any lack of clearness in the written part of the specification, and furnished the requisite description of the invention. The fact that the drawings show the invention is denied, but I am inclined to think that they do, partly from an inspection of the copies which are attached to the ordinary printed copies of the patent and partly from the testimony of the patentee as to the care and exactness which were used by the draughtsman, and shall therefore assume that the plaintiffs are correct in their position in this regard.

The second claim employs general language, but if the second feature of the invention is properly designated and described in the specification, the language aptly includes that feature. This question is then presented: One part of an invention is properly described and the second part is not alluded to in the written or descriptive part of the specification, but is shown in the drawings. The second claim is broad enough to include the second portion of the invention, if it had been properly described in the specification. Can the drawings supply the entire absence of written description, and enable the second claim to be so construed as to include the omitted portion of the invention? The statute seems to be clear upon this point. Section 4888 provides that the inventor shall file in the patent-office a written description of his invention, "and of the manner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected to make, construct, compound, and use the same." Section 4889 provides that when the nature of the case admits of drawings, the applicant shall furnish one copy, * * * which shall be filed in the patent-office, "and a copy of the drawing, to be furnished by the patent-office, shall be attached to the patent as a part of the specification."

There must be a written description of the invention. A description, which is said to be vague and uncertain, may be made clear by the drawings, which are a part of the specification. An imperfect written description will be aided by correct drawings, but when the written description is not only silent in regard to a feature of the invention, but places the novelty upon a different and described feature, the drawings will not help an entire omission, because the necessity of a written description is made absolute by the statute. Doubtful or ambiguous specifications can be aided and made plain by drawings, but they cannot supply an entire absence of description in the specification. *Tinker* v. *Wilber*, *etc.*, *Manuf'g Co.*, 1 Fed. Rep. 138; *Frazer* v. *Gates & Scoville Iron Works*, 22 Fed. Rep. 439, 442.

Again, the drawings will not aid the non-description, because, although they may show to an expert the new feature, they do not show that the patentee claimed to be the inventor of that part of the die, when in his specification he had distinctly placed his invention upon another part. *Ives* v. *Sargent*, (Sup. Ct. Oct. term, 1886,) 7 Sup. Ct. Rep. 436.

It follows that the construction of the second and third claims must

be that dies, A and B, are the dies of the first claim, and that the defendants do not infringe. This conclusion makes it unnecessary to consider the validity of the third claim. No. 314,192, being for the method of making ox-shoes by the dies of the first patent, is also not infringed. The bill is dismissed.